# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| DORIS CRUMBLEY, | ) | CASE NO. 1:17CV2096 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Doris Crumbley, ("Plaintiff" or "Crumbley"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her applications for Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.

## I.  PROCEDURAL HISTORY

In August and September 2013, Crumbley filed applications for POD, DIB, and SSI,

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security.

alleging a disability onset date of January 19, 2013 and claiming she was disabled due to Complex Regional Pain Syndrome ("CRPS"), right hand/arm pain, lack of coordination, dizziness/vertigo, "back issues (L-4, L-5, S-1)," and stress. (Transcript ("Tr.") 18, 220, 227, 244.) The applications were denied initially and upon reconsideration, and Crumbley requested a hearing before an administrative law judge ("ALJ"). (Tr. 18, 146-152, 158-169, 170, 171.)

On June 22, 2015, an ALJ held a hearing, during which Crumbley, represented by counsel, and an impartial vocational expert ("VE") testified. (Tr. 43-83.) On July 22, 2015, the ALJ issued a written decision finding Crumbley was not disabled prior to September 2, 2014 but became disabled on that date and remained disabled through the date of the decision. (Tr. 18-36.) The ALJ's decision became final on August 14, 2017, when the Appeals Council declined further review. (Tr. 1-6.)

On October 5, 2017, Crumbley filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 15, 20.) Crumbley asserts the following assignments of error:

> (1) The ALJ erred at step two of the sequential evaluation in failing to consider all of the plaintiff's diagnoses as severe impairments.

> (2) The ALJ erred at step five of the sequential evaluation in finding that Plaintiff is capable of performing work that exists in significant numbers.

(Doc. No. 15.)

## II. EVIDENCE

### A. Personal and Vocational Evidence

Crumbley was born in March 1961 and was fifty-four (54) years-old at the time of her administrative hearing, making her a "person closely approaching advanced age," under social

2

security regulations.  (Tr. 33, 76, 220.)  *See* 20 C.F.R. §§ 404.1563(d) & 416.963(d).  She has at

least a high school education and is able to communicate in English.  (Tr. 33, 76.)  She has past

relevant work as a records supervisor, audit clerk, file clerk, personnel scheduler, and

administrative assistant.  (Tr. 33, 74-76.)

**B.      Relevant Medical Evidence**[2]

On January 19, 2013, Crumbley experienced soreness in her right hand after packing and

moving boxes.  (Tr. 300.)  She wore a wrist splint, which was apparently too tight.  (*Id.*)

Crumbley fell asleep while wearing the splint and woke the next morning with burning in her

right hand.  (*Id.*)  Several days later, on January 24, 2013, Crumbley presented to Phillip Chiang,

M.D., with complaints of numbness and tingling in the fingers of her right hand.  (Tr. 327-328.)

On examination, Dr. Chiang noted Crumbley's right wrist was "very uncomfortable on

palpation."  (*Id.*)  He found significantly decreased sensation in her right middle finger and

paresthesia in her right index finger.  (*Id.*)  Dr. Chiang diagnosed (1) paresthesia of the right first

through fourth fingers, "especially on the second and third finger tips due to carpal tunnel

syndrome;" and (2) milder carpal tunnel on the left involving third and fourth finger tips.  (*Id.*)

He prescribed a Medrol Dose Pack and Gabapentin, and referred Crumbley to a specialist.  (*Id.*)

On February 12, 2013, Crumbley presented to orthopedist Alfred Cianflocco, M.D.  (Tr.

299-301.)  She reported 50% improvement while on the Medrol Dose Pack and stated she had

"continued to improve slowly" with decreased numbness and increased range of motion in her

right hand.  (Tr. 300.)  On examination of Crumbley's right upper extremity, Dr. Cianflocco

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is
limited to the evidence cited in the parties' briefs.

noted no evidence of any swelling or atrophy with normal skin color, temperature, and capillary refill.  (*Id*.)  He did find decreased sensation to light touch and some difficulty opposing the thumb and making a fist.  (*Id*.)  Dr. Cianflocco concluded "more than likely this represents a compression neuropathy at the median nerve."  (*Id*.)  He prescribed a soft, loose fitting night splint and prescribed Neurontin.  (Tr. 300-301.)

On February 27, 2013, Crumbley reported some improvement but complained of side effects from the Neurontin.  (Tr. 304.)  Dr. Cianflocco recommended an EMG, which she underwent on March 6, 2013.  (Tr. 304, 313-316.)  The EMG of Crumbley's right upper extremity was "poorly tolerated" but indicative of right median neuropathy at or distal to the wrist, consistent with carpal tunnel syndrome, mild in degree.  (Tr. 313.)  There was no evidence of right cervical radiculopathy.  (*Id*.)

Crumbley returned to Dr. Cianflocco on March 12, 2013.  (Tr. 306-310.)  She reported some improvement in her right hand symptoms, including improved ability to grasp and somewhat improved sensation.  (Tr. 308.)  Crumbley also complained of foot pain and paresthesias involving her left toes.  (*Id*.)  An x-ray of her feet taken that date showed moderate bilateral hallux valgus with bunions, bilateral hammertoe deformities, plantar calcaneal spurs, and moderate degenerative arthritis.  (Tr. 311.)  Although examination of Crumbley's feet was largely normal, Dr. Cianflocco felt "she does have some podiatric issues including the bunions, plantar fasciitis, and heel pain" and referred her for a podiatric and spine center consult.  (Tr. 308.)

On March 28, 2013, Crumbley presented to Augusto Hsia, M.D., for evaluation of her foot and lower back pain.  (Tr. 521-528.)  She complained of bilateral foot numbness,

4

intermittent left leg pain, and a "long history" of lower back pain.  (Tr. 521.)  With regard to her back pain, Crumbley indicated it was "constant, intermittent, worse with bending, vacuuming, not really with walking, standing."  (*Id*.)  Examination revealed decreased lumbar range of motion, tenderness in the lumbar paraspinals, normal gait, normal reflexes, normal muscle strength, negative straight leg raise, and normal hip and knee range of motion.  (Tr. 523-524.)  Dr. Hsia assessed foot numbness, chronic intermittent low back pain, and acute exacerbation of left leg pain.  (Tr. 524.)  He ordered a baseline lumbar x-ray, prescribed a Medrol Dose Pack, and referred Crumbley to physical therapy.  (*Id*.)

Crumbley underwent an x-ray of her lumbar spine on March 28, 2013.  (Tr. 603-604.)  It showed minimal degenerative change, as follows:

> [S]light tilt of the lower thoracic spine to the left, possibly positional.  There is minimal narrowing of the L5/S1 interspace consistent with mild degenerative change.  Vertebral and remaining intervertebral disk space heights are maintained.  No gross soft tissue abnormality is seen.

(Tr. 603.)

On April 8, 2013, Crumbley presented for her first physical therapy session with Mark Jakomin, P.T.  (Tr. 529-533.)  She rated her lumbar pain a 4 on a scale of 10, describing it as constant, pinching, and burning.  (Tr. 529.)  Crumbley reported her pain was worse with bending, and that it prevented her from walking more than ½ of a mile or sitting for more than one hour.  (*Id*.)  Examination revealed a normal functional gait pattern, minimal to moderate limitation in her lumbar range of motion, normal muscle strength in her lower extremities, and no major tenderness.  (Tr. 530-531.)

Two days later, on April 9, 2013, Crumbley presented to podiatrist Georgeanne Botek, D.P.M., for evaluation of foot pain and numbness.  (Tr. 534-537.)  She rated her pain a 7 on a

5

scale of 10.  (Tr. 534.)  On examination, Dr. Botek noted positive Tinel's over Crumbley's

bilateral posterior tibial nerves, slightly limited ankle range of motion, hypermobility, full muscle

strength, and no crepitation.  (Tr. 535.)  She assessed plantar fasciitis of the left foot, moderate

HAV (i.e., bunions); and positive Tinel's with possible tarsal tunnel.  (*Id.*)  Dr. Botek

recommended home stretching exercises.  (*Id.*)

Crumbley returned for physical therapy on April 15, 2013.  (Tr. 538-540.)  She reported

"she was running a lot of errands over the weekend and she was getting in and out of the car a lot

[and] this really aggravated her leg pain."  (Tr. 538.)  Crumbley rated both her lower back and

leg pain a 4-5 on a scale of 10.  (*Id.*)  Her therapist noted an "extensive review" of Crumbley's

home exercise plan was required "with some re-instructions and modifications [due to] dizziness

and pain."  (Tr. 539.)

On April 22, 2013, Crumbley began treatment with pain management physician Pasha

Saeed, M.D.  (Tr. 541-545.)  She complained of right hand pain, which she rated a 6 on a scale of

10.  (Tr. 541.)  On examination, Dr. Saeed noted normal gait, negative straight leg raise, normal

extremities, normal reflexes, no pain to palpation in Crumbley's back, and normal motor and

sensory function.  (Tr. 542-543.)  He also found normal range of motion in her hips, knees,

shoulders, and spine, intact muscular strength, normal sensation to light touch and pinprick, and

negative Babinski's.  (Tr. 543.)  With regard to Crumbley's right hand, Dr. Saeed noted

hyperalgesia, fair range of motion, and no trophic changes, temperature or color changes.  (Tr.

542-543.)  He assessed Reflex Sympathetic Dystrophy ("RSD"),[3] prescribed Cymbalta, and

---

[3] RSD is now commonly referred to as Complex Regional Pain Syndrome ("CRPS").

6

advised her to continue physical therapy.  (Tr. 543.)

On that same date, Crumbley presented to orthopedist Steven Maschke, M.D.  (Tr. 332-336.)  She complained of right hand and wrist pain, which she rated a 6 on a scale of 10.  (Tr. 332.)  On examination, Dr. Maschke noted positive Tinel's and paresthesia.  (Tr. 334.)  He stated "touching any of her fingers gives significant burning pain" and noted Crumbley's right hand was sweaty and discolored.  (*Id*.)  Dr. Maschke felt she demonstrated stigmata of CRPS and recommended occupational therapy for "aggressive edema control and range of motion."  (*Id*.)

On April 24, 2013, Crumbley presented for her first session of occupational therapy with Nancy Agacinsky, OTR/L.  (Tr. 337-340.)  She reported the following functional limitations: "unable to use right hand to hold/carry objects, difficulty opening jars/containers/doors, unable to perform heavy household chores, difficulty sleeping, severe pain."  (Tr. 337.)  Examination revealed moderate edema and slowed coordination.  (Tr. 338.)  The therapist noted Crumbley became emotional during the evaluation and suggested "patient could benefit from some counseling services as well."  (Tr. 339.)

Meanwhile, Crumbley presented for physical therapy sessions with Therapist Jakomin on April 23, April 29, and May 7, 2013.  (Tr. 547-552, 556-558.)  She reported some improvement in her back pain and lower extremity numbness, stating she felt the exercises were helping.  (Tr. 550.)  During her May 7, 2013 session, Crumbley stated her lumbar pain had decreased, rating in a 1-2 on a scale of 10.  (Tr. 556.)  She indicated she could take care of herself normally without increased pain and stated "pain does not prevent me from walking any distance."  (*Id*.)  Crumbley also indicated "my normal homemaking/job activities increase my pain, but I can still perform all that is required of me."  (*Id*.)  Examination revealed normal gait, "nil" to minimal limitation in her

lumbar range of motion, normal muscle strength, and no major tenderness.  (Tr. 557.)  The therapist found Crumbley had "much improved back mobility without pain" and discharged her from physical therapy due to "goal achievement and maximal PT benefit."  (Tr. 555-558.)

The record reflects Crumbley returned for multiple sessions of occupational therapy for her right hand and wrist throughout May 2013.  (Tr. 553-554, 560-561, 362-363, 366-370.)  She reported some improvement in her arm and hand pain in early May, but later complained of increased neck pain.  (Tr. 553, 560.)  On May 23, 2013, Crumbley reported decreased hand pain but increased right shoulder pain.  (Tr. 362.)  She presented with "significant . . . tightness and trigger points," and showed "significant impairment" in performing the finger to nose test.  (*Id.*)

On May 23, 2013, Crumbley returned to Dr. Saeed for follow-up regarding her right hand pain.  (Tr. 563-566.)  On examination, Dr. Saeed noted no pain to palpation in Crumbley's back, normal reflexes, negative straight leg raise, normal motor and sensory, normal gait, and normal posture.  (Tr. 564.)  He assessed RSD upper limb, right arm pain, and stress; and referred her to neurology and psychiatry.  (Tr. 564.)

The following day, Crumbley presented to neurologist Joseph Rudolph, M.D., for evaluation of her hand pain.  (Tr. 567-574.)  She complained of "much numbness as well as tingling/pins and needles," as well as weakness in grip strength, bilateral hand tremor, and "overreaching for things."  (Tr. 567-568.)  Crumbley also reported "a long history of pressure in the back of her neck and on her forehead."  (Tr. 568.)  Examination revealed decreased sensation, sensory ataxia, and some abnormal reflexes.  (Tr. 569.)  Dr. Rudolph also noted normal attention and concentration, normal memory, normal language function, normal bulk and strength including in the small muscles of the hands, and normal gait, posture, balance, stride length, and

8

arm swing.  (*Id.*)  He assessed CRPS in her hand and felt there was a possibility of additional

nerve injury in her neck.  (*Id.*)  Dr. Rudolph ordered an MRI of Crumbley's cervical spine and

prescribed braces and Effexor.  (*Id.*)

Crumbley underwent an MRI of her cervical spine on June 3, 2013, which showed "subtle

hyperintensity within the right dorsal aspect of the cord at C4-C5, C5 and C6 levels."  (Tr. 618.)

The record reflects Crumbley presented for eight (8) occupational therapy sessions for her

right arm pain in June 2013.  (Tr. 371-396.)  Crumbley generally reported improvement in her

hand pain, stating "cleaning and washing things is more tolerable now."  (Tr. 371, 374-375, 377-

378, 380.)  On June 14, 2013, Crumbley reported significant back pain which she rated a 10 on a

scale of 10.  (Tr. 380.)  Several days later, however, she indicated the "back pain is down and

[she] did a lot of bending down taking care of pets."  (Tr. 385.)  Her therapist noted "patient

continues to make improvement however slow."  (Tr. 386, 389, 392.)

On June 24, 2013, Crumbley complained of increased dizziness.  (Tr. 575.)  Examination

findings were largely normal, including normal gait and tandem walking, negative Romberg,

intact motor and sensory function, intact cerebellar function, no tremor, normal reflexes, and full

muscular strength in her bilateral upper and lower extremities.  (Tr. 576.)

Crumbley returned to Dr. Maschke on July 22, 2013.  (Tr. 341-344.)  She complained of

pain in her right forearm, right wrist, right hand and left hand, which she described as constant

and rated a 5 on a scale of 10.  (Tr. 341.)  Crumbley reported "she is happy that her hand now at

least moves more normally but [is] still having lots of pain, really all the way up into the neck

region."  (Tr. 342.)  On examination, Dr. Maschke noted decreased swelling and "dramatically

improved" range of motion.  (*Id.*)  He indicated her sensation was "different really in all of her

fingers in both hands."  (*Id.*)  Dr. Maschke did not think Crumbley was a good candidate for carpal tunnel surgery and recommended she continue treatment with her pain management physicians.  (*Id.*)

On August 3, 2013, Crumbley returned to Dr. Hsia, with complaints of intermittent bilateral knee numbness.  (Tr. 590-594.)  She indicated her low back pain was now a two out of ten, but improved with stretching.  (Tr. 590.)  On examination, Dr. Hsia found decreased lumbar range of motion, decreased lower extremity reflexes, normal lower extremity strength, negative straight leg raise, and no edema.  (Tr. 591-592.)  He also noted bilateral knee crepitus with no tenderness or warmth.  (Tr. 592.)  Dr. Hsia recommended knee stretching/icing and back exercises, and indicated possible lumbar injections if Crumbley's back pain worsened.  (*Id.*)

Several months later, on October 15, 2013, Crumbley returned to Dr. Rudolph.  (Tr. 605-616.)  She complained, in relevant part, of the following:

> 1) Her poor coordination is what interferes with her life mostly– it is as if her arms do not know where they are.  She spills, bangs her hand in the door, and once in swatting a bee, she hit herself in the head.
>
> * * *
>
> 3) There is also action tremor in the left hand, though if she is braced against the table, she can write very well.  However, after writing for more than a few minutes, she gets tremendous pain.  (It took a week for her to fill out her social security forms).  She may have improved slightly– she can make a partial fist, which she was not able to do last time.
>
> * * *
>
> 5) She has been experiencing some short term memory loss- wondering if she took pills, for example.
>
> * * *

10

> 7) There have been jolt-like sensations in OT or when she uses her hand.  The searing pains are subdued, but she still gets occasional shooting jolts.

(Tr. 605-606.)  On examination, Dr. Rudolph noted slight weakness in Crumbley's right handgrip, decreased sensation in her right hand, and action tremor.  (Tr. 606.)  He also found normal gait, posture, balance, stride length, arm swing, and base.  (*Id*.)  Dr. Rudolph was concerned about demyelinating disease and ordered an MRI of Crumbley's brain.  (Tr. 606-607.)  Crumbley underwent the MRI on October 22, 2013, which revealed a "small focus of abnormal T2 signal in the left mesial temporal/hippocampal region" that was "nonspecific in nature" and "may reflect the sequela of remote injury and/or infarct."  (Tr. 610, 621.)

Crumbley returned to Dr. Maschke on October 21, 2013.  (Tr. 345-348.)  She reported "some gains in her digital motion" and indicated "the pain is slowly getting better."  (Tr. 345.)  Dr. Maschke recommended she continue with pain management, neurology, and physical therapy.  (Tr. 345.)

Meanwhile, the record reflects Crumbley presented for numerous occupational and physical therapy sessions for her right hand and wrist between July and December 2013.  (Tr. 400-495.)  While she reported some variation in her pain levels, Crumbley's therapy notes generally reflect slow but steady improvement in her right hand pain, mobility, and functioning.  (*Id*.)  During this time period, Crumbley reported she was beginning to use her right hand with activities such as cleaning, dishes, laundry, and "with pots, cups, removing and hanging pictures."  (Tr. 408, 414, 417, 420, 438, 441, 445, 446, 448, 453.)  She did, however, continue to report stiffness, poor control/coordination, and shaking in her right hand.  (Tr. 438, 440, 450, 457-458, 463, 483.)  In November 2013, for example, she reported the following:

> Difficulty holding/carrying things; I drop things all the time.  I feel like a klutz.  I run

11

> into walls.  I have to be careful when I'm climbing stairs; I have to pay attention so
> I don't fall; Unable to help at family functions because she is afraid of dropping
> things; doesn't hold niece's baby because she is afraid of dropping baby.  Can't carry
> two plates at the same time. . .

(Tr. 464.)  The therapist noted Crumbley appeared depressed and overwhelmed.  (Tr. 467.)

On December 23, 2013, Crumbley presented for physical therapy with complaints of low back pain due to "all the things I have been doing at home," including baking and wrapping presents.  (Tr. 492.)  She reported her neck was better but her hand still bothered her and her coordination remained impaired.  (*Id*.)  The therapist noted Crumbley ambulated independently without an assistive device with a good gait pattern.  (*Id*.)  She noted overall improvement in functioning and discharged Crumbley from physical therapy due to "goal achievement and maximal PT benefit."  (Tr. 494-495.)

On January 3, 2014, Crumbley returned to Dr. Botek for follow up regarding her left plantar foot pain.  (Tr. 623-626.)  She reported no difficulty performing or completing routine daily living activities (Tr. 626) and identified walking as one of her activities/hobbies (Tr. 623.) On examination, Dr. Botek noted a plantar lateral lesion with hemorrhagic center, positive Tinel's over her tibial nerves bilaterally, slightly limited ankle range of motion, hypermobility, and full muscle strength.  (Tr. 623-624.)  She performed a superficial debridement of the lesion. (Tr. 624.)  Crumbley returned to Dr. Botek the following month for follow up, at which time she reported active bleeding and difficulty performing routine activities.  (Tr. 627, 629.)

On February 26, 2014, Crumbley returned to Dr. Rudolph with complaints of right hand pain; white, immobile fingers at night; arm weakness and numbness; and neck pain with overexertion.  (Tr. 632.)  She also reported poor coordination, dropping things frequently, tremors, and "memory issues."  (Tr. 632-633.)  On examination, Dr. Rudolph noted normal

12

muscle strength, normal sensation, a careful gait, and dysmetria.  (Tr. 633.)  He found Crumbley suffered from "what may be more than (simply) CRPS, and she may have had an episode of something like transverse myelitis."  (*Id*.)  Dr. Rudolph also concluded Crumbley's hand tremor seemed to be the "tremor of weakness rather than of Parkinson's or essential tremor."  (*Id*.)  He recommended she follow up with a thyroid specialist.  (Tr. 634.)

On March 6, 2014, Dr. Rudolph completed a Medical Source Statement ("MSS") regarding Crumbley's physical impairments.  (Tr. 497-500.)  He identified a diagnosis of CRPS/RSD and noted Crumbley suffered from loss of sensation in her right hand and fingers, electrical shooting pain, loss of strength in her right hand, poor coordination, tremor of the left hand, and discoloration at night (e.g., "fingers go white.") (Tr. 497.)  Dr. Rudolph also noted she had a weak right hand grip, decreased sensation in her right hand, and "sensory ataxia (cannot touch nose with eyes closed) worse on the [right]."  (*Id*.)   He characterized her prognosis as "poor for recovery."  (*Id*.)

Dr. Rudolph concluded Crumbley had the following physical limitations:

- She could walk two city blocks without rest or severe pain;

- She could sit for 30 minutes at one time before needing to get up, and for a total of at least six hours in an eight hour workday;

- She could stand for 30 minutes at one time before needing to change position, and stand/walk for a total of about two hours in an eight hour workday;

- She needs a job that permits shifting positions at will;

- She needs periods of walking around during an eight hour day; e.g., she must walk around every 30 minutes for five minutes;

- She would need unscheduled breaks twice per day for 15 minutes due to muscle weakness, chronic fatigue, pain/paresthesias, and numbness;

13

- She can lift and carry 10 pounds occasionally and less than 10 pounds frequently;

- She can frequently climb stairs, occasionally twist and stoop (bend), and rarely crouch/squat or climb ladders;

- She has significant limitations with reaching, handling or fingering due to right hand weakness with poor coordination;

- She will likely be off task 15% of the work day;

- She is capable of tolerating moderate stress;

- On average, she would miss about three days of work per month as a result of her impairments or treatment.

(Tr. 498-500.)  Lastly, Dr. Rudolph noted Crumbley was "having some memory issues recently and difficulty grasping concepts and instructions."  (Tr. 500.)

On that same date, Dr. Rudolph completed a "Reflex Sympathetic Disorder (RSD)/Complex Regional Pain Syndrome, Type 1 (CRPS) Medical Source Statement."  (Tr. 501-504.)  Therein, Dr. Rudolph identified the following signs and symptoms: swelling; changes in skin color or texture; weakness and numbness; burning, aching or searing pain initially localized to the site of injury; increased sensitivity to touch; joint stiffness; restricted mobility; muscle spasm; abnormal sensations of heat or cold; muscle pain; impaired sleep; and impaired coordination.  (Tr. 501.)  He also indicated Crumbley suffered from cognitive limitations, impaired attention and concentration, impaired short term memory, and reduced ability to attend to tasks.  (Tr. 502.)  He noted Crumbley's "pain is in her HAND thus walking is less helpful." (*Id*.)  Dr. Rudolph assessed the same functional limitations as in his other MSS issued on that same date with regard to Crumbley's abilities to sit, stand, walk, lift and carry, twist, stoop (bend), and crouch/squat.  (Tr. 502-503.)  With specific regard to her hands/fingers/arms, Dr.

14

Rudolph found Crumbley could (1) grasp, turn, and twist objects with her right hand 20% of the time and 100% of the time with her left hand; (2) engage in fine manipulation 20% of the time with her right hand and 100% of the time with her left hand; (3) reach in front of her body 50% of the time with her right hand and 100% of the time with her left hand; and (4) reach overhead 30% of the time with her right hand and 100% of the time with her left hand.  (Tr. 503.)  Lastly, and as in his other MSS, Dr. Rudolph found Crumbley would be off task 15% of the work day; would be capable of tolerating moderate stress; and would likely be absent about three days per month due to her impairments or treatment.  (Tr. 504.)

Several weeks later, on March 19, 2014, Crumbley underwent a Physical Capacity Evaluation ("PCE") at the Cleveland Clinic Rehabilitation and Sports Therapy Department.  (Tr. 505-509.)  Therapist Lidiya Kanarsky, OTR/L, noted impaired grip/pinch strengths in Crumbley's right hand, although she found Crumbley exhibited "questionable effort."  (Tr. 506-507.)  She also found (1) normal motor function; (2) 4/5 bilateral upper extremity strength; (3) 4/5 right lower extremity strength; (4) 3+/5 left hip strength; and (5) 4/5 left knee and ankle strength.  (Tr. 507.)  Crumbley was able to tolerate a total of 45 minutes of sitting, 30 minutes uninterrupted; and a combined total of 30 minutes of standing and walking, with 11 minutes of uninterrupted standing and 7 minutes of uninterrupted walking.  (*Id*.)  She was able to climb stairs and walk on an 8" beam without difficulty, and balance and crawl with some difficulty.  (Tr. 508.)  Therapist Kanarsky summarized her findings as follows:

> The client's performance on this Physical Capacity Evaluation was consistent with a part-time sedentary job task.  The client would not be advised to lift more than 8.5 [pounds] occasionally and more than 4-5 [pounds] frequently.  Any repetitive task [would] have to [be] alternated with non-repetitive. This client's job has to allow for frequent changing in working position.  Mrs. Crumbley was noted with significant shaking in her bilateral hands towards the end of the evaluation, her deficits on

15

[testing] were not significant, therefore, the reason for this shaking is questionable. (Tr. 509.)

On April 21, 2014, Crumbley presented to neurologist Jeffrey Kim, M.D., with complaints of "memory difficulty," poor coordination, dropping things, and "bump[ing] . . . into things constantly."  (Tr. 648-660.)  She stated she "is able to perform most [activities of daily living] – bathing, clothing, shopping, driving [but] does have difficulty with cooking due to difficulty using her arms."  (Tr. 649.)  On examination, Dr. Kim found normal muscle tone and bulk, 5/5 strength bilaterally, normal reflexes, decreased sensation in the right upper extremity, no tremors, normal gait, and negative Romberg's.  (Tr. 651.)  He noted Crumbley had some difficulty on finger-to-nose testing.  (*Id*.)  Dr. Kim concluded Crumbley's neurologic exam was "largely normal other than some mild difficulty with coordination on finger-to-nose and sensory deficits in the [right upper extremity] that have been attributed to her CRPS."  (*Id*.)  He advised Crumbley there was "unlikely to be a neurodegenerative process" and the problem was "likely an issue with [her] working memory that can be improved with lifestyle modifications, including improving sleep and working on stressors."  (*Id*.)

On June 5, 2014, Crumbley returned to Dr. Saeed with complaints of neck, back and lower extremity pain.  (Tr. 747-752.)  Physical examination findings were normal.  (Tr. 748.)  Dr. Saeed found Crumbley "does not have any signs of RSD now" and "has good [range of motion] and no sensory or motor deficits."  (*Id*.)  He noted she had "multiple somatic complaints" and referred to her psychiatry for evaluation.  (*Id*.)

On June 9, 2014, Crumbley presented to neurologist Jagan A. Pillai, M.D., and physician assistant Athena Loughnn, PA-C.  (Tr. 661-667.)   She complained of short term memory

16

problems and "consistently hitting into things with her arms."  (Tr. 661-662.)  Mental status

examination findings were normal.  (Tr. 663.)  Dr. Pillai found Crumbley's cognitive changes

were "likely related to stress/sleep and pain related factors" and "unrelated to neurodegenerative

etiology."  (*Id*.)  He referred her to "mind/body holistic psychotherapy."  (Tr. 664.)

On July 15, 2014, Crumbley returned to Dr. Rudolph.  (Tr. 763-768.)  He found she was

"not improving very much" and advised her to continue her medications.  (Tr. 764.)

On July 22, 2014, Crumbley underwent an ultrasound guided right breast biopsy.  (Tr.

678-687.)  She was subsequently diagnosed with right breast cancer and elected to proceed with

a partial mastectomy.  (Tr. 668, 676.)  On August 28, 2014, Crumbley underwent a pre-operative

medical consultation.  (Tr. 696-705.)  Physical examination findings were normal (including

normal cognition, normal motor skills, normal gait, and no weakness or sensory deficit) and

Crumbley was cleared for surgery.  (Tr. 701.)  Crumbley underwent a right partial mastectomy

on September 2, 2014.  (Tr. 692-695.)

The record reflects that, after her mastectomy, Crumbley complained of increased pain in

both arms, her right breast, and her left shoulder.  (Tr. 711.)  She underwent physical and

occupational therapy for these conditions from October 2014 through February 2015.[4]  (Tr. 810-

923.)

On May 26, 2015, psychiatrist Jill Mushkat Conomy, M.D., completed a Mental RFC

Questionnaire regarding Crumbley's mental functional limitations.  (Tr. 925-930.)  She indicated

Crumbley had just returned to treatment and had participated in two sessions.  (Tr. 925.)  Dr.

---

[4]  As the ALJ found Crumbley disabled as of September 2, 2014, the Court will not
discuss in detail the medical evidence subsequent to that date.

Conomy identified clinical findings of agitation, fear, worry, preoccupation with health, neuropathy, and pain.  (*Id*.)  She also noted the following signs and symptoms: decreased energy, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, persistent disturbances of mood or affect, and sleep disturbance.  (Tr. 926.)

In terms of Crumbley's mental functional limitations, Dr. Conomy found she had an "unlimited or very good" ability to (1) ask simple questions or request assistance; (2) interact appropriately with the general public; (3) maintain socially appropriate behavior; and (3) adhere to basic standards of neatness and cleanliness.  (Tr. 927-928.)  She had a "limited but satisfactory" ability to (1) remember work-like procedures; (2) understand, remember, and carry out very short and simple instructions; (3) accept instructions and respond appropriately to criticism from supervisors; (4) get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; and (5) understand, remember, and carry out detailed instructions.  (*Id*.)  Dr. Conomy also found Crumbley was "seriously limited but not precluded" from performing the following activities: (1) work in coordination with or proximity to others without being unduly distracted; (2) make simple work-related decision; (3) respond appropriately to changes in a routine work setting; (4) be aware of normal hazards and take appropriate precautions; (5) set realistic goals or make plans independently of others; and (6) travel in unfamiliar places.  (*Id*.)

Dr. Conomy further concluded Crumbley was "unable to meet competitive standards" in the following areas: (1) maintain attention for two hour segment; (2) maintain regular attendance and be punctual within customary tolerances; (3) sustain an ordinary routine without special supervision; (4) deal with normal work stress; and (5) use public transportation.  (*Id*.)  In

18

addition, Dr. Conomy found Crumbley had "no useful ability to function" with respect to her abilities to (1) complete a normal workday and workweek without interruptions from psychologically based symptoms; (2) perform at a consistent pace without an unreasonable number and length of rest periods; and (3) deal with stress of semiskilled and skilled work.  (*Id*.) Finally, Dr. Conomy concluded Crumbley would be absent from work more than four days per month as a result of her impairments or treatment.  (Tr. 929.)

Dr. Conomy identified the medical basis of these limitations as follows: "severe pain disorder with psychological factors, secondary to medical condition; severe anxiety; and also dealing with cancer and reactions to meds and radiation burns."  (Tr. 928.)  She also stated that "pain interferes with [Crumbley's] ability to sustain herself in a work environment."  (Tr. 929.) Lastly, Dr. Conomy found Crumbley would be able to manage benefits in her own best interest. (Tr. 930.)

On May 29, 2015, Dr. Rudolph completed a Physical RFC Assessment regarding Crumbley's physical functional limitations.  (Tr. 1038-1039.)  In this opinion, he found Crumbley could lift and carry 20 pounds occasionally and 10 pounds frequently.  (Tr. 1038.)  Dr. Rudolph found she had no limitations in her abilities to stand/walk or sit and, further, did not opine she would need to periodically alternate sitting, standing, or walking to relieve discomfort. (*Id*.)  He found Crumbley could never push/pull; less than occasionally reach (including overhead); occasionally handle (gross manipulation); occasionally finger (fine manipulation); and frequently feel.  (Tr. 1039.)  Finally, Dr. Rudolph concluded Crumbley would be absent from work 2-3 times per month due to her impairments or treatment.  (*Id*.)

## C.     State Agency Reports

### 1.      Mental Impairments

On September 11, 2013, Crumbley underwent a psychological consultative examination with Herschel Pickholtz, Ed. D.  (Tr. 318-324.)  She reported she was unable to work due to CRPS "primarily in her right hand and some in her left hand."  (Tr. 319.)  Crumbley indicated she "never experienced any clinical levels of depression" and "has not experienced any anxiety complaints."  (*Id*.)  She stated she was not taking psychiatric medications and had never been hospitalized for psychiatric reasons.  (*Id*.)  Crumbley stated she previously received mental health treatment for two years to help her deal with "her marital issues and divorce."  (Tr. 320.)  She was not, however, currently experiencing any levels of anxiety or depression.  (Tr. 319-320.)

Crumbley stated she graduated from high school, took two courses at community college, and received some vocational training.  (Tr. 320.)  She reported her work evaluations at her various jobs were good.  (Tr. 320-321.)

In terms of her daily activities, Crumbley reported the following:

She takes care of her hygiene everyday.  She'll change her clothing everyday.  She'll wash  and  shampoo her hair daily.  In terms of chores, she'll vacuum and mop the floors once  a  week  but doesn't sweep the floors.  She does the laundry once a week but doesn't iron.  She shops for food  twice a week and cooks dinner daily.  She doesn't utilize the computer recently but in the past  used Google and Yahoo.  She uses a phone daily and talks to her doctors, best friend and sister. She operates the TV everyday. * * * She reads the newspaper and  magazines.  In terms of daily activities from 6 a.m. until 12 p.m., she'll  wash  up, do  some  back  and  hand exercises,  take a walk and talk to her mother.  From 12 p.m. until 5 p.m., she'll do exercises, run errands, take a walk and talk to her mother.   From 5 p.m. until bedtime, she'll cook, eat, watch TV and take a walk.  In terms of hobbies or interests, she'll do exercises for 6 hours a day with some breaks.  She does not babysit.  She socializes with relatives once a month.  She socializes with friends once a month and they go out for a cup of coffee.  She attends religious services once a week. * * * On Friday nights, she exercises, watches TV, and talks to her friend.  On Saturdays, she indicated it is the same routine.  On Sundays, she goes to church from 11:30 to 12:30 p.m. and after services goes home or goes to the store.

(Tr. 322-323.)

Dr. Pickholtz found Crumbley was well oriented to time, place and person.  (Tr. 322.) She had no difficulties understanding and responding to the questions and directives presented to her, and was cooperative with consistent and appropriate eye contact.  (Tr. 321.)  Her speech was easily understood, intelligible, logical, coherent, relevant, goal directed, and linear.  (*Id.*) Crumbley's affect was appropriate and her mood was euthymic.  (*Id.*)  Indeed, Dr. Pickholtz noted Crumbley "laughed and smiled and was energetic," noting "she failed to describe any traditional symptoms of depressive disorder."  (*Id.*)  Dr. Pickholtz also found no significant signs of autonomic anxiety.  (*Id.*)  He concluded her overall recall fell within the average range and found her intellectual functioning fell "within the at least average range."  (Tr. 322.)  Dr. Pickholtz determined Crumbley would be able to monitor benefits in an independent fashion should they be granted.  (*Id.*)

Dr. Pickholtz diagnosed Adjustment Disorder with anxiety, mild, and assessed a Global Assessment of Functioning of 63, indicating mild symptoms.[5]  (Tr. 323.)  In terms of the four broad functional areas, Dr. Pickholtz found as follows:

> **1.    Describe the claimant's abilities and limitations in understanding, remembering and carrying out instructions**.  The estimated IQ, based upon the responses to the evaluation, fell at least within the average range.  Her capacities to

---

[5] The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments.  A GAF score between 61 and 70 indicates some mild symptoms (e.g., depressed mood or insomnia) or some difficulty in social, occupational, or school functioning but generally functioning pretty well.  A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

understand, remember, and carryout instructions do not appear to be impaired.

**2.   Describe the claimant's abilities and limitations in maintaining  attention and concentration, and in maintaining persistence and pace to perform simple tasks and to perform multi-step tasks**.   Her capacities for attention and concentration, based upon recall of digits forwards and backwards and mathematical computational skills, fell in the average range.  Her persistence and speed during the evaluation did not reflect any impairment.  Her capacities to perform 1 to 3 step tasks as a result of her current psychiatric complaints does not reflect any significant impairment.

**3.   Describe the claimant's abilities and limitations in responding to supervision and to coworkers in a work setting**.   Her capacities to relate to coworkers and others based upon her current levels of social interaction and presentation and the mild nature of her current psychiatric complaints falls within the slight range of impairment at worst.

**4.   Describe the claimant's abilities and limitations in responding to work pressures in a work setting**.   Her capacities to handle the stresses and pressures of work secondary to her mild affective complaints and based upon her description of her current daily activities and abilities to handle daily expectations and demands falls within the slight range of impairment at worst.

(Tr. 323-324.)

On September 26, 2013, state agency psychologist Bruce Goldsmith, Ph.D., reviewed

Crumbley's medical records and completed a Psychiatric Review Technique ("PRT").  (Tr. 94-

95.)  He found Crumbley had no restrictions in her activities of daily living, and had mild

difficulties in maintaining social functioning and concentration, persistence, or pace.  (*Id*.)  Dr.

Goldsmith stated Crumbley's "impairments result in slight abnormalities which would have no

more than a minimal effect on [her] mental ability to perform basic work activities."  (*Id*.)  He

concluded "there is no severe mental impairment documented."  (Tr. 95.)

On January 7, 2014, state agency psychologist Carl Tishler, Ph.D., reviewed Crumbley's

medical records on reconsideration and completed a PRT.  (Tr. 123.)  He reached the same

conclusions as Dr. Goldsmith.  (*Id*.)

### 2.      Physical Impairments

On September 30, 2013, state agency physician Gerald Klyop, M.D., reviewed Crumbley's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment.  (Tr. 96-98.)  He found Crumbley could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about 6 hours in an 8 hour workday; and sit for about 6 hours in an 8 hour workday.  (*Id.*)  Dr. Klyop concluded Crumbley's ability to push/pull was limited in her right upper extremity, finding she was restricted to occasional hand controls on the right.  (*Id.*)  He opined Crumbley could never climb ladders, ropes or scaffolds or crawl, but had an unlimited capacity to balance, stoop, kneel, crouch, and climb ramps and stairs.  (*Id.*)  Finally, Dr. Klyop found Crumbley was limited to occasional handling and fingering with her right hand. (*Id.*)

On January 8, 2014, state agency physician Lynne Torello, M.D., reviewed Crumbley's medical records on reconsideration and completed a Physical RFC Assessment.  (Tr. 124-126.) She agreed with the limitations assessed by Dr. Klyop with the exception that she found Crumbley was limited to occasional handling, fingering, and feeling with her right hand.  (Tr. 126.)

### D.    Hearing Testimony

During the June 22, 2015 hearing, Crumbley testified to the following:

- She completed the twelfth grade and took some college classes.  (Tr. 76.)  In 2000, she managed a micrographics department and ran a lab for micrographics, processing, and duplicating.  (Tr. 49-50.)  She later worked for a hospital.  (Tr. 53.)  She began her employment as a file clerk, and later worked at the front desk doing correspondence and assembly analysis of ER records.  (Tr. 53-56.) She then worked for a non-medical home care company and ran a lab for micrographics, where she scheduled care givers and visited clients.  (Tr. 57-58.)  Her last job was an administrative position at a doctor's office.  (Tr. 60-62.)  She was laid off

23

and unsuccessfully sought employment for over a year. (Tr. 62.)

- When she was unable to find a job, she moved in with her elderly mother.  (Tr. 62-63.)  Her wrists were bothering her, and she started wearing a brace.  (*Id*.) One night, she fell asleep with a brace on her arm.  (Tr. 63.)  The brace impinged on her nerve and the next morning her right arm "felt like it was on fire."  (Tr. 63.)

- She was subsequently diagnosed with complex regional pain syndrome ("CRPS").  (Tr. 63.)  Both of her hands are affected, but her right hand is worse. (Tr. 63-64.)  She experiences burning, numbness, tingling, "electrical pains," morning stiffness, hypersensitivity, discoloration, and swelling in her hands. (Tr. 64, 70, 72.)  She also drops things "very easily."  (Tr. 64, 66-67, 73-74.) Some days she can use her hands and other days she cannot.  (Tr. 64.)  She sometimes has problems brushing and drying her hair, buttoning buttons, and using zippers.  (Tr. 64, 66-67.)  She can work on a computer for no more than an hour before needing a break.  (Tr. 65.)

- She was diagnosed with breast cancer and had a lumpectomy in September 2014. (Tr. 65-66.)  After that, she began experiencing increased pain in her left arm and hand.  (Tr. 65-66.)  The problems in both of her hands "escalated" after her lumpectomy.  (Tr. 71.)

- On a typical day, she wakes up and spends 30 to 60 minutes doing her hand/arm home exercises.  (Tr. 66-67.)  She has trouble with showering because her medications make her dizzy in the morning.  (Tr. 67.)  She has difficulty with household chores.  (Tr. 68.)  She can vacuum and do the laundry but she "has to be careful" and it takes longer than it used to.  (Tr. 69.)  She goes to the grocery store and is able to carry her groceries as long as they are not too heavy.  (Tr. 68-69.)  She can lift less than ten pounds.  (Tr. 74.)  She is no longer able to do yard work or gardening.  (Tr. 68.)

- She sees a therapist to help her deal with stress.  (Tr. 69.)  Pain impacts her ability to handle stress, concentrate and focus.  (*Id*.)  This is compounded by the fact that she does not sleep well.  (Tr. 69-70.)  Her balance and coordination are "off."  (Tr. 69-70.)  She also has "proprioception issues," explaining "I don't know where my space is, which is why I'm always hurting myself."  (Tr. 82.) She also has an issue with processing information and with her "working memory."  (Tr. 80-81.)

The VE testified Crumbley had past work as a record supervisor (light but performed as medium, skilled, SVP 7); audit clerk (sedentary but performed as medium, skilled, SVP 7); file

24

clerk (light but performed as medium, semi-skilled, SVP 3); personnel scheduler (sedentary, semi-skilled, SVP 4); and administrative assistant (sedentary, skilled, SVP 7).  (Tr. 74-76.)  The ALJ then posed the following hypothetical question:

> I want you to assume an individual who can engage in light exertion,[6] who is limited to occasional use of hand controls bilaterally.  Who should never climb any ladders, ropes, or scaffolds, and who should never crawl.  This individual is limited in the use of the dominant right hand to occasional handling, fingering and feeling.  Can you tell me whether or not there's any work consistent with the Claimant's past work that could be performed?

(Tr. 76-77.)

The VE testified the hypothetical individual would not be able to perform Crumbley's past work but would be able to perform other representative jobs in the economy, such as usher/attendant (light, unskilled, SVP 2); interviewer (light, unskilled, SVP 2); and security guard (light, semi-skilled, SVP 3).  (Tr. 77-78.)

The ALJ then asked the VE a second hypothetical that was the same as the first but added the limitation that "use of the hands to handling, fingering, and feeling would be occasional bilaterally."  (Tr. 78.)  The VE testified there would be no work for such an individual.  (*Id.*)

Crumbley's counsel then asked the VE to consider the first hypothetical but with the

---

[6] "Light work" is defined as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 CFR § 404.1567(b). Social Security Ruling 83–10 clarifies that "since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off or on, for a total of approximately six hours of an 8–hour workday." SSR 83–10, 1983 WL 31251 (1983).

modification that the hypothetical individual was limited to lifting and carrying ten pounds occasionally and five pounds frequently.  (Tr. 79.)  The VE testified the individual would still be able to perform the usher/attendant and security guard positions.  (*Id*.)

Finally, Crumbley's counsel asked the VE as follows: "In any of the hypotheticals that [the ALJ] proffered, if we were to assume that that hypothetical individual would be off task or unable to complete a workday or work week, up to 20% of the time, would those jobs be available?"  (Tr. 79-80.)  The VE testified "no, that would be work preclusive for all jobs."  (Tr. 80.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of

26

a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Crumbley was insured on her alleged disability onset date, January 19, 2013, and remained insured through December 31, 2016, her date last insured ("DLI.")  (Tr. 18.)  Therefore, in order to be entitled to POD and DIB, Crumbley must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th

27

Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2.    The claimant has not engaged in substantial gainful activity since the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3.    Since the alleged onset date of disability, January 19, 2013, the claimant has had the following severe impairments: chronic regional pain syndrome and breast cancer (associated with lymphadema) (20 CFR 404.1520(c) and 416.920(c)).

4.    Since the alleged onset date of disability, January 19, 2013, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, I find that prior to September 2, 2014, the date the claimant became disabled, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant is limited to occasional use of hand controls bilaterally; never climbing of any ladders, ropes or scaffolds; never crawling; and the dominant right hand is limited to occasional handling, fingering, and feeling.

6.    After careful consideration of the entire record, I find that beginning on September 2, 2014, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant is limited to occasional use of hand controls bilaterally; never climbing of any ladders, ropes or scaffolds; never crawling; and bilateral use of the hands is limited to occasional handling, fingering, and feeling.

7.    Since January 19, 2013, the claimant has been unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

8.    Prior to the established disability onset date, the claimant was an individual closely approaching advanced age.  The claimant's age category has not changed since the established disability onset date (20 CFR 404.1563 and

416.963).

9.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

10.      Prior to September 2, 2014, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills. Beginning on September 2, 2014, the claimant has not been able to transfer job skills to other occupations (See SSR 82-41 and 20 CFR part 404, Subpart P, Appendix 2).

11.      Prior to September 2, 2014, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

12.      Beginning on September 2, 2014, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966.)

13.      The claimant was not disabled prior to September 2, 2014, but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 18-36.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant

29

evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld

where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### Step Two/Evaluation of the Opinion Evidence

In her first assignment of error, Crumbley argues the ALJ "erred at step two of the sequential evaluation in failing to consider all of the plaintiff's diagnoses as severe impairments." (Doc. No. 15 at 9.) Specifically, she claims the ALJ improperly failed to consider her degenerative disc disease, anxiety disorder, and adjustment disorder as severe impairments, causing her "analysis at subsequent steps of the sequential evaluation [to be] flawed." (*Id.*) With respect to her degenerative disc disease, Crumbley argues physical examination findings demonstrate reduced range of motion in her lumbar spine, decreased sensation in her toes, and reduced reflexes. (*Id.* at 9-10.) She asserts "this impairment clearly causes significant limitations in [her] ability to stand or walk for long periods of time, or lift heavier objects." (*Id.*

31

at 10.)  With respect to her mental impairments, Crumbley argues she suffers from anxiety and has issues with focus, concentration and memory that result in more than a minimal effect on her ability to perform the basic mental demands of work activity.  (*Id*. at 11.)

The Commissioner argues the ALJ "properly concluded that [Crumbley's] low back impairment, adjustment disorder, and anxiety disorder were nonsevere at step two of the sequential evaluation process."  (Doc. No. 20 at 19.)  She maintains the ALJ acknowledged and addressed the medical evidence regarding Crumbley's degenerative disc disease but properly noted the many normal physical examination findings in the record, objective evidence indicating only minimal degenerative changes, and treatment notes indicating Crumbley improved with stretching and physical therapy.  (*Id*. at 19-20.)  With regard to Crumbley's mental impairments, the Commissioner argues the ALJ discussed these impairments at step two and properly relied on the lack of significant mental health treatment, the opinions of state agency psychologists Drs. Goldsmith and Tischler that her mental impairments were non-severe, and Dr. Pickholtz's determination that she suffered a slight mental impairment at worst.  (*Id*. at 20-21.)  Finally, the Commissioner notes the ALJ expressly acknowledged Crumbley's degenerative disc disease and mental impairments at step four and, thus, any error is harmless.  (*Id*. at 23.)

At step two of the sequential evaluation, an ALJ must determine whether a claimant has a "severe" impairment.  *See* 20 C.F.R. §§ 404.1520(a) (4)(ii) & 416.920(a)(4)(ii).  To determine if a claimant has a severe impairment, the ALJ must find that an impairment, or combination of impairments, significantly limits the claimant's physical or mental ability to do "basic work activities."  *See* 20 C.F.R. § 416.920(c).  Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs," and include: (1) physical functions such as standing, sitting,

lifting, handling, etc.; (2) the ability to see, hear and speak; (3) understanding, carrying out, and

remembering simple instructions; (4) use of judgment; (5) responding appropriately to

supervision, co-workers, and usual work situations; and, (6) dealing with changes in a routine

work setting.  20 C.F.R. §§ 404.1521(b) & 416.921(b).[7]

The Sixth Circuit construes the step two severity regulation as a "*de minimis* hurdle,"

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n. 2 (6th Cir. 2007), intended to "screen out

totally groundless claims."  *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th

Cir.1985).  *See also Anthony v. Astrue*, 2008 WL 508008 at * 5 (6th Cir. Feb. 22, 2008).

However, if an ALJ makes a finding of severity as to just one impairment, the ALJ then "must

consider limitations and restrictions imposed by all of an individual's impairments, even those

that are not 'severe.'"  SSR 96–8p, 1996 WL 374184, at *5 (July 2, 1996).  This is because

"[w]hile a 'not severe' impairment(s) standing alone may not significantly limit an individual's

ability to do basic work activities, it may--when considered with limitations or restrictions due to

other impairments--be critical to the outcome of a claim."  *Id.*  "For example, in combination

with limitations imposed by an individual's other impairments, the limitations due to such a 'not

severe' impairment may prevent an individual from performing past relevant work or may

narrow the range of other work that the individual may still be able to do."  *Id.*

When the ALJ considers all of a claimant's impairments in the remaining steps of the

---

[7] Revised versions of these regulations took effect on March 27, 2017 and apply to
disability applications filed on or after that date.  *See* 82 Fed. Reg. 5868 (January 18,
2017). In addition, pursuant to 20 C.F.R. § 404.1520a(a), "when [the Social Security
Administration] evaluate[s] the severity of mental impairments for adults ... [it] must
follow a special technique at each level in the administrative review process."  Crumbley
does not specifically argue that the ALJ erred because she failed to follow the "special
technique" set forth in this regulation.

disability determination, the failure to find additional severe impairments at step two does "not constitute reversible error."  *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *see also Nejat v. Comm'r of Soc. Sec.*, 2009 WL 4981686 at * 2 (6th Cir. 2009).  The Sixth Circuit has observed that where a claimant clears the hurdle at step two (i.e. an ALJ finds that a claimant has established at least one severe impairment) and claimant's severe and non-severe impairments are considered at the remaining steps of the sequential analysis, "[t]he fact that some of [claimant's] impairments were not deemed to be severe at step two is ... legally irrelevant."  *Anthony v. Astrue*, 2008 WL 508008 at * 5.

Here, at step two, the ALJ found Crumbley suffered from the severe impairments of CRPS and breast cancer (associated with lympedema).  (Tr. 20.)  The ALJ further found Crumbley's degenerative disc disease and adjustment disorder were "non-severe."  (Tr. 20-24.) The Court will address the parties' arguments with respect to her degenerative disc disease and adjustment disorder/anxiety separately, below.

### Degenerative Disc Disease

With regard to her degenerative disc disease, the ALJ found this impairment to be non-severe, explaining as follows:

> In regards to the degenerative disc disease, the claimant has been noted to have a past medical history of degenerative disc disease of L5-S1 (Exhibit l7F). The claimant has complained of back pain during the alleged period of disability, yet a review of symptoms was notably negative for joint pain or swelling, numbness or weakness (Exhibit 10F, 12).  The claimant reported some moderate pain and some problems with usual activities, though no problems with walking or self-care (Exhibit 10F, 16).  A physical exam noted decreased lumbar range of motion, positive tenderness, and decreased sensation in the tips of the toes, though a normal gait and negative straight leg raise (Exhibit 10F, 11-14). An x-ray of the lower back taken on March 28, 2013, showed minimal degenerative changes with no acute process (Exhibit 6F, 106).  The claimant underwent physical therapy in April 2013 for the lower back pain, and

reported  functional limitations with bending, though she reported she could lift light to medium weights, take care of herself normally  without increased pain, could not walk for a ½ mile or sit for more than 1 hour, but could stand as long as she wanted (Exhibit 10F, 19).

On August 20, 2013, the claimant reported low back pain at a 2/10, and complaints of knee numbness without weakness (Exhibit 10F, 80).  The claimant was noted to have decreased lumbar range of motion, decreased reflexes, and lower extremity strength within normal limits, negative straight leg raising, and bilateral knee crepitus with no tenderness (Exhibit 10F, 81 ).  In January 2014, the claimant reported to her physical therapist that she had lower back pain, though improved neck pain, and that her back was "just a little sore from  all the things  I have been doing at home" including baking and wrapping presents (Exhibit 6F, 133).  The claimant reported a decrease in the cervical pain radiating down her upper extremities from a 2/10, decreased to 0/10 after the therapy session and the claimant  was recommended to  be discharged from therapy due to goal achievement and maximal benefit (Exhibit 6F, 135-136).  On June 6, 2014, the claimant was treated by Dr. Pasha Saeed for complaints of neck, back, and lower extremity pain, and was assessed with lumbago (Exhibit 18F, 10-11).  On examination, Dr. Saeed also noted a normal gait and posture, no back pain to palpitation, good flexion and extension, 2+ symmetric reflexes, normal motor and sensation, and a negative  straight leg raising test (Id.). As such, I conclude  that these impairments do  not significantly limit the claimant's ability to perform basic  work activities; therefore, for the purposes of this  decision, the  aforementioned impairments are "non-severe."

(Tr. 24.)

At step four, the ALJ began by stating she had "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p." (Tr. 25.)  The decision acknowledged Crumbley's allegations of back pain but noted she was able to perform numerous activities of daily living, including cleaning, laundry, shopping, vacuuming, and mopping.  (Tr. 26.)  The ALJ also emphasized Crumbley's statements she walked outside daily for exercise with one pound weights, could walk 1/3 of a mile before needing to stop and rest, and did not have any difficulty with standing.  (*Id*.)  With

regard to the medical evidence, the ALJ acknowledged Crumbley was treated for complaints of

back pain in April 2013.  (Tr. 27.)  However, the ALJ noted the many normal physical

examination findings in the record, including normal gait, normal motor bulk and strength, and

normal reflexes. (Tr. 27-31.)  Of particular relevance, the ALJ observed that, in July 2014,

Crumbley denied back pain.  (Tr. 30.)

      The ALJ then considered the opinion evidence, including Dr. Rudolph's March 2014

opinions, as follows:

> On March 6, 2014, Dr. Joseph Rudolph completed a medical source statement
> indicating numerous restrictions from the chronic regional pain syndrome
> and reported symptoms in the upper extremities, particularly in the hands and
> fingers, and poor coordination (Exhibit 7F).  Dr. Rudolph opined that her
> conditions would prevent her from sitting for more than 30 minutes at a time,
> would need to shift positions at will, would need periods of walking, problems
> lifting, and would be off task 15% of the time and miss three days per month
> (*Id*.).  **However, this opinion is given little weight as Dr. Rudolph did not explain
> or provide support for the allegations including how the claimant's hand and
> finger symptoms would prevent her from the reported activities such as
> sitting for extended periods or the opined memory loss or cognitive issues**
> (*Id*.).  **This is further apparent in a second form, this one specific to
> complex regional pain syndrome (CRPS), in which Dr. Rudolph added a note
> stating that "her pain is in her HAND thus walking is less helpful" (Exhibit 8F,
> 2), yet continues to restrict the claimant's ability to sit, stand, and walk**. Dr.
> Rudolph opined that the claimant would have restrictions in the use of her right
> upper extremity, to using the hands for 20% of the day for grasping, turning, and
> twisting, using the fingers for 20% of the day with fine manipulation, and using the
> arms for 50% of the day for reaching in front of the body, and 30% for overhead
> reaching, and would have no limitations with the use of the left upper extremity
> (Exhibit 8F, 3).  **Given the internal inconsistencies, the limited narrative
> explanation for the proposed limitations, and the lack of support in the
> longitudinal treatment history for the severity of the alleged limitations, I also
> give this opinion little weight.**

(Tr. 29.)  The ALJ also evaluated the March 2014 Physical Capacity Evaluation, which

concluded Crumbley was limited to part-time sedentary work.  (*Id*.)  The ALJ accorded this

opinion "very little weight" in light of the "questionable effort and symptoms expressed during

the examination, as well as the lack of objective support for a part-time sedentary limitation in the medical evidence."  (*Id.*)

The ALJ then formulated the RFC for the period prior to September 2, 2014, which limited Crumbley to a reduced range of light work, including occasional use of hand controls bilaterally, never climbing of any ladders/ropes/scaffolds, never crawling, and the dominant right hand is limited to occasional handling, fingering and feeling.  (Tr. 25.)

Substantial evidence supports the ALJ's determination that Crumbley's degenerative disc disease was not "severe" during the relevant time period.  In finding this impairment non-severe, the ALJ relied principally on Crumbley's largely normal physical examination findings, objective evidence showing only minimal degenerative disc disease, and the lack of evidence showing functional limitations in walking, sitting, standing, or lifting.  The ALJ's findings are supported by substantial evidence in the record.  As noted *supra*, Crumbley complained of back pain in March 2013, stating it was worse with bending but "not really with walking, standing." (Tr. 521.)  While examination findings on that date included decreased range of motion and tenderness, Dr. Hsia also found normal gait, normal reflexes, normal muscle strength, and negative straight leg raise.  (Tr. 523-524.)  An x-ray taken March 28, 2013 showed only minimal degenerative change at L5-S1.  (Tr. 603.)  During physical therapy, examination revealed normal gait, "minimal to moderate limitation in lumbar range of motion," normal muscle strength, and no major tenderness.  (Tr. 531.)  Examinations in April and May 2013 also revealed normal gait, negative straight leg raise, normal reflexes, normal range of motion in Crumbley's spine, intact muscular strength, and no pain to palpation in her back.  (Tr. 542-543, 564, 569.)  By May 2013, Crumbley reported her lumbar pain had decreased (rating it a 1-2 on a scale of 10) and indicated

she could take care of herself normally without increased pain.  (Tr. 556.)  She also stated "pain does not prevent me from walking any distance."  (*Id*.)  Examination again revealed normal gait, "nil" to minimal limitation in lumbar range of motion, normal muscle strength, and no major tenderness.  (Tr. 557.)  The therapist found Crumbley had "much improved back mobility without pain" and discharged her from physical therapy due to goal achievement.  (Tr. 557-558.)

Examination in June 2013 showed normal gait and tandem walking.  (Tr. 576.)  In August 2013, Crumbley indicated her low back pain was a 2 out of 10 but "improved with stretching."  (Tr. 590.)  While Dr. Hsia noted decreased lumbar range of motion, he also found normal lower extremity strength and negative straight leg raise.  (Tr. 591-592.)  Examination in October 2013 showed normal gait, posture, balance, stride length, arm swing, and base.  (Tr. 606.)  In December 2013, Crumbley complained of increased back pain due to "all the things I have been doing at home;" however, her therapist noted she ambulated independently with a "good gait pattern" and discharged her from physical therapy.  (Tr. 492, 494-495.)  In January 2014, Crumbley reported no difficulty performing or completing routine daily activities and identified walking as one of her activities/hobbies.  (Tr. 623, 626.)  Examination in April and June 2014 was again normal and Crumbley reported she was able to perform most activities of daily living.  (Tr. 649-651, 748.)

Crumbley nonetheless argues the severity of her degenerative disc disease is supported by Dr. Rudolph's March 2014 opinions.  (Tr. 497-500, 501-504.)  While the ALJ did not discuss Dr. Rudolph's opinions at step two, she did address them at step four, according them "little weight."  (Tr. 29.)  Crumbley argues the ALJ ran afoul of the "treating physician rule" by failing to provide "good reasons" for discounting Dr. Rudolph's opinions.  As discussed below, the

38

Court finds this argument is without merit.

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[8]  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (quoting SSR 96-2p, 1996 WL 374188 at *4 (SSA July 2, 1996)).[9]  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[10]  *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence,

---

[8] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

[9]  SSR 96-2p has been rescinded.  This rescission is effective for claims filed on or after March 27, 2017.  *See* SSR 96-2p, 2017 WL 3928298 at *1.

[10] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

39

*id.* § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting SSR 96-2p, 1996 WL 374188 at *5).  *See also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'"  *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406.  The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not

40

accepting them.  *See King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability.  This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled.  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*. It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

As noted *supra*, on March 29, 2014, Dr. Rudolph opined (in relevant part) that Crumbley could (1) sit for 30 minutes at one time before needing to get up, and for a total of at least six hours in an eight hour workday; (2) stand for 30 minutes at one time before needing to change positions, and stand/walk for a total of about two hours in an eight hour workday; (3) walk two city blocks without rest or severe pain; (3) lift and carry 10 pounds occasionally and less than 10 pounds frequently; and (4) frequently climb stairs, occasionally twist and stoop, and rarely crouch/squat or climb ladders.  (Tr. 498-500.)  He also concluded she needed a job that permitting shifting positions at will, would need periods of walking around during an eight hour day (for five minutes every thirty minutes), would need unscheduled breaks twice per day for 15 minutes, would be off task 15% of the workday, and would miss about three days of work per month as a result of her impairments or treatment.  (*Id.*)  *See also* Tr. 502-503.

The Court finds the ALJ articulated "good reasons" for rejecting these opinions.  The

41

ALJ rejected Dr. Rudolph's assessment of Crumbley's lifting/carrying, standing, walking and postural restrictions for the principal reason that Dr. Rudolph "did not explain or provide support for the allegations including how claimant's hand and finger symptoms would prevent her from the reported activities."  (Tr. 29.)  The ALJ also rejected the opinion on the grounds it contained internal inconsistencies, offered only a limited narrative explanation for the proposed limitations, and lacked support in Crumbley's longitudinal treatment history.  (*Id*.)

The ALJ's stated reasons for rejecting Dr. Rudolph's opinions are supported by substantial evidence.  The record reflects Dr. Rudolph treated Crumbley for her CRPS (which was limited to her right arm, hand, and fingers) and not for her degenerative disc disease.  This is reflected in Dr. Rudolph's March 2014 opinions, in which he identified a diagnosis of CRPS/RSD and noted Crumbley suffered from loss of sensation in her right hand and fingers, loss of strength in her right hand, tremor of the left hand, weak right hand grip, and decreased sensation in her right hand.  (Tr. 497, 501.)  Notably, Dr. Rudolph does not identify a diagnosis of degenerative disc disease or otherwise make any mention of lumbar/spinal pain in either of his opinions.  Indeed, in his CRPS/RSD Medical Source Statement, Dr. Rudolph specifically clarifies that Crumbley's "pain is in her HAND."  (Tr. 502.)  Moreover, as the ALJ correctly notes, Dr. Rudolph fails to provide any explanation for why he believes Crumbley's right arm/hand pain would result in restrictions in her abilities to sit, stand, walk, or engage in postural activities (such as twisting, stooping, crouching, or bending).  Nor does he otherwise provide any support for these limitations.

Further, substantial evidence supports the ALJ's conclusion that Crumbley's longitudinal treatment history does not support Dr. Rudolph's proposed lifting, sitting, standing,

walking and postural limitations.[11]  As set forth at length above, while physical examinations

occasionally revealed decreased lumbar range of motion and tenderness, the record contains

numerous normal physical examination findings throughout the relevant time period, including

normal gait, negative straight leg raise, normal reflexes, normal range of motion in Crumbley's

spine, intact muscular strength, and no pain to palpation in her back.  (Tr. 523-524, 531, 542-543,

557, 564, 569, 576, 606.)  Further, Crumbley often reported no difficulty performing or

completing routine daily activities and identified walking as one of her activities/hobbies.[12]  (Tr.

623, 626, 649.)

Accordingly, the Court finds substantial evidence supports the ALJ's step two finding

that Crumbley's degenerative disc disease is not a "severe" impairment.  The Court further finds

that, even if the ALJ did err at step two, the ALJ's consideration of the cumulative effect of

---

[11] Crumbley argues the ALJ erred in according "little weight" to Dr. Rudolph's March 2014 opinion and "some weight" to his May 2015 opinion because those opinions are consistent with each other.  The Court notes, however, that Dr. Rudolph's March 2014 and May 2015 opinions are not, in fact, consistent with each other with respect to his proposed sitting, standing, and walking limitations.  While Dr. Rudolph proposes significant restrictions in Crumbley's abilities to sit, stand, and walk in his March 2014 opinion, he did not assess any limitations in these areas in his May 2015 opinion.  (Tr. 1038- 1039.)  Moreover, in the March 2014 opinion, Dr. Rudolph opines Crumbley can lift no more than 10 pounds (either occasionally or frequently); however, in his May 2015 opinion, he concludes she can lift and carry 20 pounds occasionally and 10 pounds frequently.  (Tr. 499, 1038.)  Thus, Crumbley's argument is without merit.

[12] For the same reasons (and although not expressly argued by the parties), the Court finds the ALJ properly rejected the conclusion set forth in Crumbley's March 2014 Physical Capacity Evaluation that she was limited to part-time sedentary work.  (Tr. 29.)  The ALJ rejected this opinion because of Crumbley's "questionable effort" and the lack of objective support for the proposed limitations in the medical record.  The Court finds the ALJ's rejection of this opinion is supported by substantial evidence in light of the many normal physical examination findings discussed above, as well as evidence and testimony that Crumbley could perform a wide array of activities of daily living (including cleaning, laundry, shopping, driving, vacuuming, mopping, and cooking.)

Crumbley's impairments (both severe and non-severe) throughout the remaining steps of the analysis rendered any such error harmless. *Maziarz*, 837 F.2d at 244.  At step four, the ALJ expressly acknowledged Crumbley's complaints of (and treatment for) back pain and indicated she "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs96-4p and 96-7p." (Tr. 25-31.)  The ALJ also discussed Dr. Rudolph's opinions regarding Crumbley's physical impairments at step four and properly accorded them "little weight," as discussed above.  (Tr. 29.)  Accordingly, the Court finds the ALJ considered Crumbley's degenerative disc disease at later steps in the decision and, therefore, any error at step two is harmless.

Accordingly, this argument in support of Crumbley's first ground for relief is without merit.

### *Adjustment Disorder/Anxiety*

Crumbley also argues the ALJ erred in finding her adjustment disorder and anxiety to be non-severe at step two.  (Doc. No. 15 at 10-11.)  The ALJ explained this finding at length, as follows:

> In regards to the adjustment disorder, this finding is supported by the State Agency psychological consultants, Bruce Goldsmith Ph.D. and Carl Tishler Ph.D., who both opined that the evidence does not document the existence of a severe mental impairment (Exhibit 1A; 2A; SA; 6A).  Although Dr. Goldsmith and Dr. Tishler did not examine the claimant, they provided specific reasons for their opinion about the claimant's residual functional capacity showing that the opinion was grounded in the evidence in the case record. I accord the above opinions great weight because the evidence received into the record, after these determinations, did not provide any new or material information that would alter any findings about the severity of the claimant's mental impairments (Social Security Ruling 96-6p).

On September 11, 2013, the claimant underwent a consultative examination with Dr. Herschel Pickholtz who assessed a mild adjustment disorder with anxiety and opined as to a global assessment of functioning (GAF) score of 63, suggesting only mild symptoms (Exhibit 2F). I give limited weight to the GAF scores assessed herein and notes that the GAF scores are of limited use in assessing the severity of a mental impairment for several reasons. GAF scores represent a clinician's judgment about the severity of an individual's symptoms or level of mental functioning at a particular moment in time, much like a snapshot. They do not provide a reliable longitudinal picture of the claimant's mental functioning. Dr. Pickholtz opined that the impact of the claimant's current psychiatric complaints relative to work functioning seemed to fall within the "slight range of impairment at worst" (Exhibit 2F, 7). Dr. Pickholtz also opined that the claimant would have no impairment in her capacity to understand, remember and carry out instructions and perform 1 to 3 step tasks; and only a slight impairment in responding to supervisors, co-workers and others and in responding to work pressures, handle daily expectations and demands (Exhibit 2F, 7-8). I give these opinions great weight as they are consistent with the examination findings and the longitudinal treatment history, and note that they are consistent with a finding of a "non-severe" mental impairment. I also find that the psychological examiner's recommendation that the claimant has the ability to assume responsibility for the management of her own funds, if granted, reflects an opinion that the claimant retains a measure of functional ability, despite the allegations of anxiety. The ability to manage one's own funds effectively, particularly in cases that may involve granting a relatively large sum of money to an individual at one time, requires significant cognitive facilities such as performing calculations, making financial decisions, dealing with financial institutions, and managing one's personal checking and/or savings accounts. In addition, managing one's finances independently requires a level of psychological stability that indicates that an individual will make decisions in their own best interests, which is particularly relevant in a case with allegations of mental impairments. I give the opinion that the claimant has the psychological and cognitive ability to manage her own funds great weight given the findings upon the examination, the documented longitudinal treatment history, and the claimant's own admissions to the examiner and find that this opinion is consistent with the classification of the claimant's adjustment disorder as a "non-severe" impairment.

On May 26, 2015, Jill Mushkat Conomy Ph.D. completed a medical source statement form indicating a diagnosis of anxiety disorder and pain disorder and opined as to a GAF of 60, indicating the high end of moderate symptoms, which is given limited weight as noted above (Exhibit 20F). Dr. Conomy, based upon recent two sessions, opined numerous symptoms and limitations including that the claimant has no useful ability to function to complete a normal workday, perform at a consistent pace, and is unable to meet competitive

standards to maintain attention for a two hour segment, maintain regular attendance, sustain an ordinary routine or deal with normal work stress, or even use public transportation, and would be seriously limited in making even simple work-related decisions (Id.). Yet Dr. Conomy also finds that she would be able to manage benefits, if awarded, in her own best interest despite these alleged significant impairments (Id.). This opinion is given very little weight, as it is unsupported in the clinical and objective evidence and is internally inconsistent. The possibility exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes. Another reality, which should be mentioned, is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patient's request and avoid unnecessary doctor-patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case. Taking into account the limited mental health treatment, the consultative examination report, and considering the opinion of Dr. Conomy, I cannot find that the claimant has severe mental impairments that would significantly limit the claimant's ability to perform basic work activities.

(Tr. 21-22.)

Substantial evidence supports the ALJ's determination that Crumbley's adjustment disorder and anxiety were not "severe" during the relevant time period. In finding these impairments non-severe, the ALJ relied on (1) the opinions of state agency psychologist Drs. Goldsmith and Tischler that Crumbley's mental impairments were non-severe, (2) the opinion of consultative examiner Dr. Pickholtz that Crumbley had only "slight impairment" in certain mental functional areas at worst; and (3) Crumbley's limited mental health treatment. These reasons are supported by substantial evidence.

During her consultative examination with Dr. Pickholtz in September 2013, Crumbley reported she had "never experienced any clinical levels of depression" and "has not experienced any anxiety complaints." (Tr. 319.) She stated she was not taking psychiatric medications and had never been hospitalized for psychiatric reasons. (*Id.*) On examination, Dr. Pickholtz

46

observed Crumbley "laughed and smiled and was energetic," noting "she failed to describe any traditional symptoms of depressive disorder." (Tr. 321.) He also found no significant signs of anxiety. (*Id.*) As the ALJ correctly noted, Dr. Pickholtz concluded Crumbley's capacities to understand, remember and carryout instructions did not appear to be impaired and, further, that her capacity for attention and concentration fell within the average range. (Tr. 323-324.) While he found she had some impairment in her ability to handle work stresses and pressures, he found her level of impairment in this area "fell within the slight range of impairment at worst." (*Id.*) Moreover, and as also noted by the ALJ, state agency psychologists Drs. Goldsmith and Tischler both determined Crumbley's mental impairments were non-severe. (Tr. 94-95, 123.)

Notably, Crumbley does not direct this Court's attention to any mental health treatment records during the relevant time period. Rather, Crumbley asserts the severity of her degenerative disc disease is supported by Dr. Conomy's May 2015 opinion and argues the ALJ failed to articulate "good reasons" for according this opinion "little weight." For the following reasons, the Court finds this argument to be without merit.[13]

_____

[13] The Court notes that, in her opinion, Dr. Conomy states Crumbley "just returned to treatment [since] a year. We have had 2 sessions." (Tr. 925.) Although not raised by the parties, the Court has some doubt as to whether Dr. Conomy constituted Crumbley's treating physician at the time she authored her May 2015 opinion. Precedent in this Circuit suggests a physician who treats an individual only twice or three times does not constitute a treating source. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 506–07 (6th Cir. 2006) ("Depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship"); *Kepke v. Comm'r of Soc. Sec.*, 636 Fed. Appx. 625, 629 (6th Cir. 2016) ("It was not improper for the ALJ to discount Dr. Chapman's opinion on the basis that he treated Kepke only three times over a three month period); *Mireles ex rel. S.M.M. v. Comm'r of Soc. Sec.*, 608 Fed. Appx. 397, 398 (6th Cir. 2015); *Helm v. Comm'r of Soc. Sec. Admin.*, 405 Fed. Appx. 997, 1000–01 n. 3 (6th Cir. 2011.) *See also Carter v. Berryhill*, 2017 WL 2544064 at * 9 (N.D. Ohio May 26, 2017); *Witnik v. Colvin*, 2015 WL 691329 at * 7 (N.D. Ohio Feb. 18, 2015); *Hickman v. Colvin*, 2014 WL 2765670 at *

As set forth *supra*, in her May 2015 opinion, Dr. Conomy found Crumbley had a wide range of significant mental functional limitations, including that she was "unable to meet competitive standards" in the following areas: (1) maintain attention for a two hour segment; (2) maintain regular attendance and be punctual within customary tolerances; (3) sustain an ordinary routine without special supervision; (4) deal with normal work stress; and (5) use public transportation.  (Tr. 927-928.)  In addition, Dr. Conomy found Crumbley had "no useful ability to function" with respect to her abilities to (1) complete a normal workday and workweek without interruptions from psychologically based symptoms; (2) perform at a consistent pace without an unreasonable number and length of rest periods; and (3) deal with stress of semiskilled and skilled work.  (*Id.*)  Dr. Conomy also concluded Crumbley would be absent from work more than four days per month as a result of her impairments or treatment.  (Tr. 929.)  While Dr. Conomy indicates her opinion is based on two recent therapy sessions, Crumbley does not direct this Court's attention to these treatment records or explain how they support Dr. Conomy's opinion.

The Court finds the ALJ articulated "good reasons" for rejecting Dr. Conomy's May 2015 opinion.  The ALJ rejected this opinion on the grounds it was "unsupported in the clinical and objective evidence and is internally inconsistent."  (Tr. 22.)  With regard to the first reason, the ALJ noted Crumbley's "limited mental health treatment" and Dr. Pickholtz's finding of slight impairment at worst.  (*Id.*)  With regard to the second reason, the ALJ found Dr. Conomy's

---

12 (M.D. Tenn. June 18, 2014).  Moreover, the Court notes Dr. Conomy's opinion is dated May 2015, which is well beyond the relevant time period herein (i.e, January 2013 through September 1, 2014).  However, as the Commissioner did not raise these arguments, the Court will presume Dr. Conomy constituted Crumbley's treating physician and, further, that her May 2015 opinion is relevant to the period under consideration herein.

48

opinion of significant mental impairment was internally inconsistent with her opinion that Crumbley could manage financial benefits independently should be they be awarded.  (*Id.*)

The Court finds the ALJ properly rejected Dr. Conomy's opinion on the basis of Crumbley's "limited mental health treatment."  As noted above, Crumbley does not direct this Court's attention to any mental health treatment records from the relevant time period. Moreover, she reported to Dr. Pickholtz in September 2013 that she had "never experienced any clinical levels of depression," "has not experienced any anxiety complaints," was not taking psychiatric medications, and had never been hospitalized for psychiatric reasons.  (Tr. 319.) Under these circumstances, the Court finds it was not error for the ALJ to reject Dr. Conomy's opinions on the basis of Crumbley's limited mental health treatment.  As noted above, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris*, 756 F.2d at 435; *Bogle*, 998 F.2d at 347-48; *Blakley*, 581 F.3d at 406.  Here, the record fails to contain any such evidence that would explain or support the rather extreme mental functional limitations offered by Dr. Conomy.  As there was no medical data or clinical evidence supporting Dr. Conomy's opinions, it was not unreasonable for the ALJ to reject them.

Accordingly, the Court finds substantial evidence supports the ALJ's step two finding that Crumbley's adjustment disorder and anxiety are not "severe" impairments.  Crumbley's first assignment of error is, therefore, without merit.

**RFC**

In her second assignment of error, Crumbley argues the RFC is not supported by substantial evidence because it fails to include limitations relating to her back and mental

impairments.[14]  (Doc. No. 15 at 12-13.)  With regard to her back pain, Crumbley asserts the ALJ erred in failing to include more restrictive limitations in her abilities to "stand or walk for long periods, or lift heavy weights."  (*Id*. at 13.)  With regard to her mental impairments, Crumbley argues the ALJ failed to adequately account for her "ongoing issues with memory and sustaining focus."  (*Id*.)  In both of these regards, Crumbley argues the ALJ erred in evaluating the opinion evidence, maintaining in particular that the ALJ should have accorded greater weight to the opinions of Drs. Rudolph and Conomy.  (*Id*. at 14-15.)

The Commissioner argues the RFC is supported by substantial evidence.  (Doc. No. 20 at 23.)  She maintains the "RFC fully accounts for [Crumbley's] limitations relating to her back impairment in limiting her to light work with no crawling or climbing of ladders, ropes, or scaffolds."  (*Id*.)  With respect to Crumbley's mental impairments, the Commissioner notes that two of the jobs identified by the VE were unskilled and involved a SVP level of two, which the regulations define as "need[ing] little or no judgment to do simple duties that can be learned on the job or in a short period of time."  (*Id*.) (quoting 20 CFR §§ 404.1568 and 416.968).  The Commissioner asserts Crumbley "has not argued that she is unable to perform unskilled, SVP level 2 work and "the record as a whole showing limited treatment, normal mental findings, and robust daily activities establishes that she can."  (*Id*.)  Finally, the Commissioner argues the ALJ properly evaluated the opinion evidence of record, including the opinions of Drs. Rudolph and Conomy.

The RFC determination sets out an individual's work-related abilities despite his or her

---

[14]  Crumbley does not argue the RFC failed to adequately account for her CRPS and/or arm, hand, and finger impairments.  Thus, the Court does not address this issue.

limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an

administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).[15]  An

ALJ "will not give any special significance to the source of an opinion on issues reserved to the

Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for

assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and

must consider all of a claimant's medically determinable impairments, both individually and in

combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

  "In rendering his RFC decision, the ALJ must give some indication of the evidence

upon which he is relying, and he may not ignore evidence that does not support his decision,

especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774

F.Supp.2d at 880 (citing *Bryan v. Comm'r of Soc. Sec*., 383 Fed. Appx. 140, 148 (3d Cir. 2010)

("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual

functional capacity determination,' and must also 'mention or refute [...] contradictory, objective

medical evidence' presented to him."))  *See also* SSR 96–8p at *7, 1996 WL 374184(SSA July

2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If

the RFC assessment conflicts with an opinion from a medical source, the adjudicator must

explain why the opinion was not adopted."))  While the RFC is for the ALJ to determine,

however, it is well established that the claimant bears the burden of establishing the impairments

that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

  Here, at step four, the ALJ acknowledged Crumbley's allegations of back pain and

---

[15] This regulation has been superseded for claims filed on or after March 27, 2017.  As Crumbley's applications were filed in August and September 2013, this Court applies the rules and regulations in effect at that time.

cognitive difficulties but noted she was able to perform numerous activities of daily living, including cleaning, laundry, shopping, vacuuming, and mopping.  (Tr. 26.)  The ALJ also emphasized Crumbley's statements she walked outside daily for exercise with one pound weights, could walk 1/3 of a mile before needing to stop and rest, and did not have any difficulty with standing.  (*Id*.)  The decision further noted Crumbley's reports that she was able to attend occasional family gatherings and church, and "has no problems getting along with family, friends, neighbors or others."  (*Id*.)

With regard to the medical evidence, the ALJ acknowledged Crumbley was treated for complaints of back pain in April 2013.  (Tr. 27.)  However, the ALJ noted the many normal physical examination findings in the record, including normal gait, normal motor bulk and strength, and normal reflexes. (Tr. 27-31.)  The ALJ also discussed that Crumbley was examined by a neurologist for memory complaints, nothing she had reported "difficulty with multi-step tasks, with distraction due to her allegations of physical pain."  (Tr. 29.)  The ALJ noted, however, that neurological examination was largely normal and cognitive examination revealed she was cognitively intact.  (Tr. 29-30.) The ALJ stated that the neurologist "found [Crumbley's] complaints were unlikely to be a neurodegenerative process and advised improving sleep and working on stressors."  (Tr. 30.)

The ALJ then considered the opinion evidence.  As discussed *supra*, the ALJ accorded "little weight" to Dr. Rudolph's March 2014 opinions and "very little weight" to the March 2014 Physical Capacity Evaluation.  (Tr. 29.)  The ALJ accorded "great weight" to the opinions of state agency physicians Drs. Klyop and Torello for the period prior to September 2, 2014, finding they were "grounded in the evidence in the case record and the claimant's allegations about her

symptoms and limitations."  (Tr. 31.)  The ALJ also accorded "greater weight" to the opinions of state agency psychologists Drs. Goldsmith and Tischler.  (*Id.*)

The ALJ then formulated the RFC for the period prior to September 2, 2014, which limited Crumbley to a reduced range of light work, including occasional use of hand controls bilaterally, never climbing of any ladders/ropes/scaffolds, never crawling, and the dominant right hand is limited to occasional handling, fingering and feeling.  (Tr. 25.)  The RFC did not contain any mental limitations.  (*Id.*)

The Court finds the RFC is supported by substantial evidence for all the reasons discussed at length *supra*.  With regard to Crumbley's degenerative disc disease, a lumbar x-ray taken March 28, 2013 showed only minimal degenerative change at L5-S1.  (Tr. 603.)  While physical examinations occasionally revealed decreased lumbar range of motion and tenderness, the record contains numerous normal physical examination findings throughout the relevant time period, including normal gait, negative straight leg raise, normal reflexes, normal range of motion in Crumbley's spine, intact muscular strength, and no pain to palpation in her back.  (Tr. 523-524, 531, 542-543, 557, 564, 569, 576, 606.)  Crumbley often reported no difficulty performing or completing routine daily activities and identified walking as one of her activities/hobbies.  (Tr. 623, 626, 649.)  Indeed, the record reflects Crumbley performed a wide array of activities of daily living, including vacuuming, mopping, laundry, cooking, and shopping.  (Tr. 322-323.)  Lastly, the ALJ properly discounted Dr. Rudolph's March 2014 opinions, as well as the March 2014 Physical Capacity Evaluation, for the reasons discussed *supra*.

With regard to her mental impairments, Crumbley does not direct this Court's attention

to any mental health treatment records from the relevant time period.  Moreover, she reported to Dr. Pickholtz in September 2013 that she had "never experienced any clinical levels of depression," "has not experienced any anxiety complaints," was not taking psychiatric medications, and had never been hospitalized for psychiatric reasons.  (Tr. 319.)  Dr. Pickholtz concluded Crumbley's capacities for attention and concentration fell within the average range, and her persistence and speed did not reflect any impairment.  (Tr. 323-324.)  He further found her overall recall fell within the average range and her intellectual functioning fell "within the at least average range."  (Tr. 322.)

While treatment records reflect Crumbley occasionally complained of memory difficulties and loss of concentration and focus, the ALJ correctly noted the many normal mental status examination findings in the record as well.  For example, in April 2014, neurologist Dr. Kim concluded Crumbley's neurologic exam was "largely normal."  (Tr. 651.)  Later, in June 2014, neurologist Dr. Pillai noted normal mental status examination findings.  (Tr. 663.)  He found Crumbley's cognitive changes were "likely related to stress/sleep and pain related factors" and "unrelated to neurodegenerative etiology."  (*Id*.)  Moreover, the ALJ properly rejected Dr. Conomy's opinion for the reasons set forth *supra*.

In sum, the Court finds Crumbley has failed to demonstrate additional limitations relating to her degenerative disc disease and/or mental impairments are warranted or otherwise show the RFC is not supported by substantial evidence.  Crumbley's assignment of error is without merit.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's

final decision be AFFIRMED.

_s/Jonathan D. Greenberg_
Jonathan D. Greenberg
United States Magistrate Judge

Date: August 20, 2018

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**